FILED

1  FRANCIS M. GREGOREK (144785)
   gregorek@whafh.com
2  BETSY C. MANIFOLD (182450)
   manifold@whafh.com
3  RACHELE R. RICKERT (190634)
   rickert@whafh.com
4  WOLF HALDENSTEIN ADLER
     FREEMAN & HERZ LLP
5  750 B Street, Suite 2770
   San Diego, CA 92101
6  Telephone:  619/239-4599
   Facsimile:  619/234-4599
7
8  DANIEL W. KRASNER
   krasner@whafh.com
9  ROBERT B. WEINTRAUB
   weintraub@whafh.com
10 WOLF HALDENSTEIN ADLER
     FREEMAN & HERZ LLP
11 270 Madison Avenue
   New York, New York 10016
12 Telephone:  212/545-4600
   Facsimile:  212/545-4653
13
14 Attorneys for Plaintiffs

15            UNITED STATES DISTRICT COURT
16        FOR THE CENTRAL DISTRICT OF CALIFORNIA

17 SUSAN E. BECK, ON BEHALF          ) Case No.
   OF WASHINGTON MUTUAL              )
18 INVESTORS FUND, INC.,             )
19                                   ) CV09-5627RSWL PJWx
20              Plaintiff,           )
                                     ) SHAREHOLDER'S
21                                   ) COMPLAINT UNDER SECTION
   vs.                               ) 36(b) OF THE INVESTMENT
22                                   ) COMPANY ACT OF 1940
23 CAPITAL RESEARCH AND              )
   MANAGEMENT COMPANY AND            ) DEMAND FOR JURY TRIAL
24 AMERICAN FUNDS DISTRIBUTORS,      )
   INC.                              )
25                                   )
26                                   )
              Defendant(s).          )
27
28

2009 JUL 31  AM 11: 34

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

Plaintiff Susan E. Beck, by and through her attorneys, as a security holder of the Washington Mutual Investors Fund, Inc. ("WMIF" or the "Fund"), a registered investment company, on behalf of the Fund, alleges upon personal knowledge as to herself, her own acts and the acts and statements of defendants in which she participated directly, including the communications with and documentation and information provided to her by defendants in the ordinary course of business; and upon information and belief as to all other matters, based upon, *inter alia,* the investigation conducted by and through her attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, news reports, other publicly available information regarding the Fund, academic studies, and other matters of public record, as follows:

## SUMMARY OF THE ACTION

1.     This is an action by a security holder of the Fund, brought under Section 36(b) of the Investment Company Act of 1940 (hereinafter sometimes "ICA"), 15 U.S.C. §§80a-35(b), against the Distributor and Investment Adviser of the Fund.  The Fund is part of the American Funds family of mutual funds, the nation's second largest mutual fund family.  Plaintiff is a shareholder in the Fund.

2.     These claims are brought exclusively under Section 36(b); thus, plaintiff need not comply with the prerequisites of shareholder litigation set forth in Federal Rules of Civil Procedure 23.1 and 23.  *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 535 n.11, 540, 104 S. Ct. 831, 838 n.11, 840-41; 78 L. Ed. 2d 645, 655 n.11, 658 (1984); *Kamen v. Kemper Fin. Sers., Inc.*, 500 U.S. 90, 108, 111 S. Ct. 1711, 1722; 114 L. Ed. 2d 152, 171-72 (1991).

3.     This action seeks to recover for the Fund excessive and disproportionate 12b-1 fees and investment advisory fees paid by the Fund to these defendant fiduciaries, who breached their fiduciary duties to the Fund under Section 36(b) of the Investment Company Act of 1940.

4.     The SEC adopted Rule 12b-1 in 1980.  Prior to its adoption, Section 12(b)

of the ICA prohibited mutual funds from using shareholder monies to promote the distribution and sale of fund shares.  Rule 12b-1 relaxed that prohibition, permitting mutual funds, under certain limited circumstances, to use shareholder money – *i.e.*, money taken directly from the funds, which decreases the value of shareholders' assets – for activities "primarily intended to result in the sale of [that mutual fund's shares]" where "there is a reasonable likelihood that the plan will benefit the [Fund] and its shareholders."

5.      In the 1980s, only a few million dollars in 12b-1 fees were paid annually by fund shareholders to their underwriters and brokers <u>in the entire mutual fund industry</u>.

6.      In 2006, *$12 billion* in 12b-1 fees were paid by mutual fund shareholders.

7.      In 2007, over *$2 billion*, or 16 2/3% of total 2b-1 fees paid, were paid by the funds comprising the American Funds family of funds alone.

8.      In 2008, over *$3.6 billion* in 12b-1 fees were paid by the funds comprising the American Funds family of funds alone.

9.      In 2008, approximately *$3.0 billion* in investment advisory fees were paid by the funds comprising the American Funds family of funds alone.

10.      In its  fiscal years ending April 30, 2007 through April 30, 2009, inclusive, the Fund and its shareholders paid/(had accrued against them) 12b-1 fees to defendants of more than *$256 million, $261 million* and *$172 million*, respectively.

11.      In the same three fiscal years, the Fund also paid investment advisory fees to defendants of more than *$157 million, $160 million* and *$110 million*, respectively.

12.      In this three year period, the 12b-1 fees and investment advisory fees paid by the Fund and its shareholders to defendants totaled more than **$1.11 billion**.

13.      In its 2009 fiscal year alone, the 12b-1 fees and investment advisory fees paid by the Fund and its shareholders to the defendants totaled more than *$282 million*.

14.      The assessment of 12b-1 fees against the Fund and its shareholders must by law be reapproved annually by the Fund's Board of Directors.

15.   Under this annual reapproval process, the Fund's Board may continue a 12b-1 plan "only if . . . in light of their fiduciary duties under . . . section 36(b) . . . there is a reasonable likelihood that the plan will benefit the [Fund] and its shareholders."

16.   The 12b-1 fees which defendants charged the Fund and its shareholders were excessive and disproportionate because, among other things: (1) the fees financed shareholder services provided by broker-dealers, but which the broker-dealers were legally obligated to provide to Fund shareholders without payment; (2) the fees grew the Fund, which created economies of scale for defendants, but those economies of scale were not (or were not in material part) passed on to the Fund and its shareholders; (3) the fees grew the Fund, but given the already very large size of the Fund, the Fund's growth inhibited its performance and eventually converted the Fund into an index fund with excessively high fees and expenses; (4) the fees were higher than those of comparable funds, in both absolute terms and with regard to the fact that the Fund acted more as an index fund; (5) defendants had the Fund pay broker-dealers multiple times for providing the same service to a customer when the broker provided the service only once for that customer (based upon charging each Fund class for a service which is performed only once for all classes combined or charging customers who own multiple funds in the American Funds family multiple times for one monthly account statement); and (6) the fees financed commissions to brokers which were materially larger than necessary to act as an incentive to sell Fund shares.

17.   In sum, the 12-1 fees paid by the Fund were excessive and disproportionate because they did not benefit the Fund and its shareholders, but primarily benefitted the defendants who obtained higher investment advisory and transfer fees as a result of the substantial increase in the size of the Fund and who kept most of the economies of scale for their own benefit, and did not share them fairly with the Fund and its shareholders.

18.   Similarly, the investment advisory fees paid by the Fund and its shareholders to defendants were excessive and disproportionate. For example, given its

very large size, the Fund acted more like an index fund, but nevertheless charged fees similar to or in excess of those charged by funds which are actively managed.  The Fund's advisory fees were excessively high in comparison to other similar funds. The Fund and its shareholders did not receive benefits from economies of scale, which all flowed to the defendants through the exorbitant advisory and 12b-1 fees.

19.     The Fund's directors, in what was essentially a self-perpetuating board, breached their fiduciary duty to independently and conscientiously review the 12b-1 fee plans, which must be reapproved annually.  The directors renewed the plans annually by rote and without giving any consideration to the growth in the size of the Fund (and its size) and the market power that size gave them in negotiating with broker-dealers. The amount of the 12b-1 fees was excessive in view of the fact that the Fund and its shareholders received no material benefit from the payment of these fees, as alleged above.  The directors made no effort to obtain and did not obtain lower 12b-1 fees, despite the fact that the fees charged approached or were equal to the highest percentage allowed by law and did not take into account the large size of the Fund and the American Funds family.

20.     Similarly, the directors breached their fiduciary duty by refusing to materially lower advisory fees despite the fact (among other reasons) that the Fund was ever-more functioning as an index fund and any economies of scale passed to shareholders were immaterial.

## PARTIES, JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action pursuant to Sections 36(b) of the Investment Company Act of 1940, 15 U.S.C. §§80a-35(b), and §80a-43, and 28 U.S.C. §§1331 (federal question jurisdiction under the laws of the United States).

22.     Venue is proper in this District under 28 U.S.C. §§1391(b) and (c).

23.     Venue also is proper in this District because the defendants are headquartered in this district.

24.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### PARTIES

**Plaintiff**

25.     Plaintiff Susan E. Beck is a resident of the State of Colorado and is the owner and holder of Fund Class A shares. She has owned Fund Class A shares since at least as early as January, 2002.

26.     The Fund is a registered investment company under the ICA.

27.     The Fund is an open-end, diversified management investment company, with an investment objective to produce income and to provide an opportunity for growth of principal consistent wit sound common stock investing. The Fund invests primarily in common stocks of established companies that are listed on, or meet the financial listing requirements of, the New York Stock Exchange and have a strong record of earnings and dividends.

28.     The Fund is organized and exists under the laws of the State of Maryland.

29.     The Fund has offices in Washington, D.C. and, upon information and belief, in Los Angeles, California.

30.     Shares of the Fund are sold throughout the United States, including within this district.

31.     As of April 30, 2009, the Fund had approximately $43.3 billion in net assets.

32.     The Fund has several different classes of shares.

33.     Shares of each class of the Fund represent an interest in the same investment portfolio.

34.     Shares of all classes of the Fund vote together on matters that affect all classes in substantially the same manner.

35.     Although 12b-1 fees are assessed against classes of shareholders, they are in effect paid for out of the assets of the Fund.

**Defendants**

36.     The American Funds family of funds consists of 30 mutual funds which have over 40 million shareholder accounts and, as of the end of calendar year 2007, more than *$1 trillion* in assets under management.

37.     It is the second largest fund family in the United States.

38.     For the American Funds, collectively, the average account size is $25,000, and sixty percent of its accounts are under $10,000, according to Paul Haaga, Vice Chairman of defendant Capital Research and Management Company.

39.     Only a very small percentage of mutual fund shareholders are financially sophisticated; most are ordinary working folk with only small amounts of money to invest.

40.     Approximately 80 percent of the assets of the Fund are held by class A shareholders.

41.     Although the difference in the terms of each class is not necessarily material to this litigation, briefly:  Class A shares incorporate an initial sales charge into the purchase price (5.75% maximum, which is a percentage of the offering price). Class B and C shares have no initial sales charge, but include a contingent deferred sales charge.

42.     All classes pay other fees (detailed below) which are all taken from Fund assets and are material to this litigation:  a management fee to the investment adviser; 12b-1 fees for distribution and/or service, and (c) fees for other expenses including transfer agent fees.

**The Investment Adviser Defendant**

43.     Defendant Capital Research and Management Company ("CRMC" or the "Investment Adviser") is the investment adviser for the Fund, as well as to all other funds within the American Funds family.

44.     CRMC is incorporated under the laws of the state of Delaware and is headquartered at 333 South Hope Street, Los Angeles, California 90071.

45.     CRMC both provides the investment advisory services and furnishes the services and pays the compensation and travel expenses of persons who perform the Fund's executive, administrative, clerical and bookkeeping functions, and provides suitable office space, necessary small office equipment and utilities, general purpose accounting forms, supplies and postage used at the Fund's offices.  The Fund pays all expenses not assumed by CRMC, including, but not limited to: custodian, stock transfer and dividend disbursing fees and expenses; shareholder recordkeeping and administrative expenses; costs of the designing, printing and mailing of reports, prospectuses, proxy statements and notices to its shareholders; taxes; expenses of the issuance and redemption of fund shares (including stock certificates, registration and qualification fees and expenses); expenses pursuant to the Fund's plans of distribution (described below); legal and auditing expenses; compensation, fees and expenses paid to independent directors; association dues; costs of stationery and forms prepared exclusively for the Fund; and costs of assembling and storing shareholder account data for the Fund.  Fund Statements of Additional Information 2007-09 (each an "SOAI").

**The Distributor Defendant**

46.     Defendant American Funds Distributors, Inc. ("AFD") is the principal underwriter of the shares of the Fund.

47.     AFD is incorporated under the laws of the state of California and likewise is headquartered at 333 South Hope Street, Los Angeles, CA 90071.

48.     AFD is the wholly-owned subsidiary of CRMC.

49.     AFD is a broker-dealer and a member of the National Association of Securities Dealers, Inc. ("NASD").

50.     AFD is the "principal underwriter" of the Fund and an "affiliated person" of CRMC as these terms are defined in ICA §36(b).

**Non-Parties Related to the Defendants**

51.    The Fund has a board of directors, as well as officers, all of whom are not defendants herein.

52.    The Fund does not hold annual meetings of shareholders.

53.    Since December 2001, the Fund has filed with the SEC and sent to its shareholders only one definitive proxy statements, the DEF 14A, for a meeting which was held in December 2007.

54.    A director's term is indefinite in length because it is not anticipated that a meeting of the Fund's shareholders will be held each year.

55.    Directors and officers of the Fund serve until their resignation, removal, retirement or death.

56.    Although the Fund SOAI states that the selection and nomination of independent directors of the fund are committed to the discretion of the independent directors during the existence of the Plans, the Fund has a Governance Committee (comprised of all "independent" directors") which selects and nominates independent director candidates to the full board of directors.  Although all eight members of this committee are identified as "independent" directors, a majority of these eight individuals (see chart below) have served on the board together since at least as early as 2005 and have nominated independent director candidates to fill all vacancies during the six year time period between shareholder meetings despite the fact that they had only been elected to the board themselves once in that time period.

57.    Thus, for all intents and purposes, the Fund's Board is self-perpetuating and does not stand for election annually as do most directors of public companies.

58.    The so-called independent Directors of the Board of Directors, and the year they joined the Board, are identified on the chart at the end of this section.

59.    Each of the "independent" Directors of the Fund serves on the Board of Directors of other mutual funds in the American Fund family.

60.    For the Fund's fiscal year ending April 30, 2009, each of the Fund's so-

called independent Directors who had served at least one full year on the Board and was still a Board member (which group comprises seven of the eight current "independent" board members) received more than $123,000 per year in total compensation from funds in the American Funds family, with an average individual compensation of approximately $179,000.

61.    The Fund has a Governance Committee, which has a Contracts Subcommittee ("Contracts Subcommittee").

62.    One of the Subcommittee's principal functions is to request, review and consider the information deemed necessary to evaluate the terms of certain agreements between the Fund and its investment adviser or the investment adviser's affiliates, such as the Investment Advisory and Service Agreement, Principal Underwriting Agreement, Administrative Services Agreement and Plans of Distribution adopted pursuant to rule 12b-1 under the ICA, that the Fund may enter into, renew or continue.  Concerning these agreements, the Governance Committee as a whole reports its recommendations to the full board of directors.

63.    In addition, the Governance Committee periodically reviews such issues as the board's composition, responsibilities, committees and compensation (through a compensation subcommittee) and other relevant issues, and recommends any appropriate changes to the full board of directors. The Governance Committee also evaluates, selects and nominates candidates for independent directors to the full board of directors.   The Governance Committee and the Contracts Subcommittee are comprised only of "independent" Directors, all of whom are identified below.

64.    Each member of the Contracts Subcommittee of the Fund also is a member of the Contracts Committee/Subcommittee of every other American Fund of which he or she is a board member.

65.    Despite the many issues for which it has responsibility, the Governance Committee of the Fund held only one meeting during the 2009 fiscal year; one meeting during the 2007 fiscal year, and upon information and belief only one meeting during

the 2008 fiscal year.

66.     Each of these meetings was held simultaneously, or *seriatim* on the same day, with the meetings of the Governance and/or Contracts Committees/Subcommittees of many of the other funds within the American Funds family of funds.

67.     The following chart show that most of the so-called independent Directors sit on the Board of Directors (and the respective Contracts Committee/Subcommittee) of at least two mutual funds in the American Funds family.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

| Fund name: "X" = board member. "*" = contracts comm/ subcomm mem. | Nariman Farvardin (2007) | Barbara Hackman Franklin (2005) | R. Clark Hooper (2003) | James C. Miller III (1992) | Donald L. Nickles (2007) | Katherine D. Ortega (2002) | William J. Shaw (2009) | John Knox Singleton (2001) |
|---|---|---|---|---|---|---|---|---|
| American High-Income Municipal Bond Fund | | | X* | | | | | |
| American High-Income Trust | | | X* | | | | | |
| Capital Income Builder | | | X* | | | | | |
| Intermediate Bond Fund of America | | | X* | | | | | |
| Limited Term Tax-Exempt Bond Fund of America | | | X* | | | | | |
| Short-Term Bond Fund of America | | | X* | | | | | |
| SMALLCAP World Fund | | | X* | | | | | |
| The Bond Fund of America | | | X* | | | | | |
| The Cash Management Trust of America | | | X* | | | | | |

| Fund name: "X" = board member. "*" = contracts comm/ subcomm mem. | Nariman Farvardin (2007) | Barbara Hackman Franklin (2005) | R. Clark Hooper (2003) | James C. Miller III (1992) | Donald L. Nickles (2007) | Katherine D. Ortega (2002) | William J. Shaw (2009) | John Knox Singleton (2001) |
|---|---|---|---|---|---|---|---|---|
| The New Economy Fund | | | X* | | | | | |
| Washington Mutual Investors Fund | X* | X* | X* | X* | X* | X* | X* | X* |
| The American Funds Tax-Exempt Series I:  The Tax-Exempt Fund of Maryland/The Tax-Exempt Fund of Virginia | X* | X* | X* | X* | X* | | | X* |

- 13 -

**The Fees At Issue in This Litigation**

68.     The fees at issue in this litigation are:

69.     Investment Advisory Fees:  Investment advisory fees are sometimes referred to as management fees.  They are paid to the investment adviser, here CRMC, for managing the portfolio of securities and for providing some of the back-office support operations required to support portfolio management.

70.     Investment advisory fees are calculated as a percentage of assets under management.  The dollar amount of such fees increases as the size of the Fund increases.

71.     12b-1 Fees:  12b-1 fees are calculated as a percentage of assets under management.  The dollar amount of such fees increases as the size of the Fund increases.

72.     There is no discount in 12b-1 fees to take into account the economies of scale resulting from the size of the Fund or the size of the American Funds family of funds.

73.     Transfer Agency Fees:  Transfer Agent services include the processing of the sale and redemption of Fund shares; maintenance of the records of shareholder accounts, and communications.  The Fund pays transfer agent fees to both affiliated and non-affiliated companies (the latter usually a broker-dealer which holds the shareholder's account) which provide transfer agent services.  The company affiliated with the Fund which provides transfer agent services is the American Funds Service Company ("AFSC"), a wholly-owned subsidiary of the CRMC.

74.     Transfer agent fees are calculated as a percentage of assets under management.  The dollar amount of such fees increases as the size of the Fund increases.

75.     The Fund paid transfer agent fees in fiscal 2008 of more than $58 million and the Fund paid more than $60 million in such fees for the Fund's fiscal year 2009.

76.     All of the funds in the American Funds family paid to defendants

approximately $825 million in transfer agent fees in during 2008.

77.     Transfer Agent fees can constitute fall-out benefits.

78.     Upon information and belief, defendant CRMC employs a consolidated financial statement with respect to its wholly-owned subsidiaries.

**The Fund's Plans of Distribution**

79.     Every class of the Fund which assesses a 12b-1 fee charges at least a 0.24% 12b-1 fee for shareholder services, sometimes known as the "service fee" or the "shareholder servicing fee."

80.     The Fund pays this service fee to defendant AFD, which pays most or all of the service fee to broker-dealers for service-related expenses.

81.     For all Fund classes which charge a 12b-1 fee greater than 0.25%, there also is a "distribution fee" of 0.75% (for a total 12b-1 fee of 1.00%).  This distribution fee is mainly used to finance payments to dealers primarily but not exclusively as commissions to compensate the individual stockbrokers for their sales activities.

82.     AFD retains for its own account a portion of the service fees from all classes of the Fund's shares.

**THE INHERENT CONFLICTS IN THE OPERATION OF A MUTUAL FUND**

83.     The Securities and Exchange Commission has stated that "Mutual funds are unique . . . in that they are 'organized and operated by people whose primary loyalty and pecuniary interest lie outside the enterprise.'"  Role of Independent Directors of Investment Companies, Securities Act Release No. 33-7754 [1999-2000 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶86, 212, at 82, 451 (Oct. 14, 1999), quoting SEC, Div. of Investment Mgmt., "Protecting Investors: A Half Century of Investment Company Regulation" 251 (1992).

**Section 36(b) of the ICA**

84.     Section 36(b) of the ICA states in relevant part:

Section 36 – Breach of Fiduciary Duty  . . . .

b.  Compensation or payments as basis of fiduciary duty; civil actions by

Commission or security holder; burden of proof; judicial consideration of director or shareholder approval; persons liable; extent of liability; exempted transactions; jurisdiction; finding restriction. For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person. With respect to any such action the following provisions shall apply:

1. It shall not be necessary to allege or prove that any defendant engaged in personal misconduct, and the plaintiff shall have the burden of proving a breach of fiduciary duty. . . .

**Section 12(b) of the ICA**

85.     Prior to the SEC's adoption of Rule 12b-1 in 1980, it was unlawful under Section 12(b) of the ICA for a mutual fund to "act as a distributor of securities of which it [wa]s an issuer."

86.     One of the reasons this was so was the inherent conflicts in the operation of a mutual fund, discussed above.

**Rule 12b-1 Was Adopted to Encourage Mutual Fund Sales Because, at that Time, There Were Net Redemptions in the Mutual Fund Industry and Because Economies of Scale Might Benefit Shareholders**

87. On May 23, 1978, the SEC announced an "advance notice of proposed rulemaking" concerning whether mutual funds should be permitted to utilize shareholder "assets to pay expenses incurred in connection with the distribution of their shares." Bearing Of Distribution Expenses By Mutual Funds, Investment Company Act of 1940, Release No. 10252 (May 23, 1978).

88. The threshold reasons the SEC gave for bringing this issue to the forefront of discussion were the net redemption of mutual fund shares industry-wide, particularly in equity funds, and the desire to increase the sale of mutual fund shares because it was perceived that increased sales of fund shares might be beneficial to investors, including that there might be economies of scale benefiting fund shareholders as the size of a fund increased. Release 10252.

89. At the time Rule 12b-1 was adopted in 1980, the mutual fund industry had experienced net redemptions from 1973 - 1979 inclusive, in equity, hybrid and bond mutual funds. In 1972, the industry had $60 billion in assets, and in 1979 it had $49 billion in assets, in equity, hybrid and bond funds. The computerization of the securities industry which has lead to exponential growth in productivity was in its infancy.

90. At the time of its adoption by the SEC in 1980, the main objectives of Rule 12b-1 were: (1) for the first time to permit mutual fund management companies, such as defendants here, to use shareholder assets to bear expenses for the distribution of Fund shares, to increase sales and benefit shareholders from economies of scale, and (2) to impose restrictions and safeguards concerning these expenditures by (a) minimizing the inherent conflicts of interest that management has in having the fund itself bear a part of the burden of selling the fund's shares; and (b) putting the decision and oversight of any such expenditures in the hands of directors, especially independent directors. SEC Release Nos. 10251, 10862, 11414 (*passim*).

**The "*Gartenberg* Factors" to Be Used in Analyzing Whether the Fees Defendants Charged to the Fund and Its Shareholders Were Excessive and Disproportionate**

91.     The "Factors" to be assessed when evaluating the legality of a 12b-1 fee or an investment advisory fee are:

(i)   the nature and quality of the services provided by the adviser to the shareholders;

(ii)  the profitability of the mutual fund to the adviser-manager;

(iii) "fall-out" benefits -- meaning whether the fee in question has been reduced to reflect the "fall-out benefits" received by defendants.  The fall-out benefits are those benefits (other than the fee in question) that flow to the adviser and its affiliates as a result of the adviser's relationship with the Fund;

(iv)  the economies of scale achieved by the Fund and whether such savings were passed on to shareholders or kept by the defendants;

(v)  comparative fee structures with other similar funds, both other funds within the same fund family or within other fund families;

(vi)  the independence and conscientiousness of the Fund's outside directors.

92.     The above six Factors, often referred to as the "Gartenberg Factors," *Gartenberg v. Merrill Lynch Asset Management*, 694 F.2d 923, 928-29 (2d Cir. 1982), *cert. denied*, 461 U.S. 906, 103 S. Ct. 1877, 76 L. Ed. 2d 808 (1983), are applicable to analyzing the legality of 12b-1 fees and investment advisory fees.

93.     There also are additional factors relevant to analyzing a 12b-1 fee.  These nine factors are listed in the narrative accompanying SEC Rule 12b-1, as adopted.  Investment Company Act Release No. 11414.

## I.    THE 12B-1 FEES ARE UNLAWFUL WHEN ANALYZED AGAINST THE RELEVANT FACTORS

94.     Many commentators and economists have noted that the use of 12b-1 fees exacerbates the conflict of interest between fund management and shareholders.

95.     A recent study by an Office within the Securities and Exchange

Commission concluded that "12b-1 plans do seem to be successful in growing fund assets, but with no apparent benefits accruing to the shareholders of the fund." Lori Walsh, "The Costs and Benefits to Fund Shareholders of 12b-1 Plans: An Examination of Fund Flows, Expenses and Returns at 11, 14, 18 (2004).

96.    Under the Gartenberg Factors, the 12b-1 fees paid by the Fund and its shareholders were excessive and disproportionate, and there was no "reasonable likelihood that the [12b-1] plan" was benefiting "the Fund and its shareholders."

97.    The Fund's 12b-1 plans, for at least the last few years: (a) should not have been renewed annually, because they provided no material benefits to the Fund and its shareholders and/or (b) should not have been renewed annually without securing significant discounts (given the size of the Fund and the American Funds family and the limited benefits to the Fund and its shareholders from the plans) so that the Fund and its shareholders were no longer paying near or at the maximum percentages permitted by law.

### A.    The Nature and Quality of the Services Provided By the Adviser to the Shareholders

98.    The 12b-1 fee paid by Fund shareholders was comprised of two components, a service fee of approximately 0.24% and a distribution fee of 0.75%.

99.    Every class of Fund shares which has a 12b-1 fee assesses either a 0.24% or 0.25% service fee, just below or equal to the maximum 0.25% 12b-1 service fee permitted by law, against the Fund and its shareholders.

100.    The 0.24 - 0.25% portion of the 12b-1 fee paid by the Fund shareholders, which is known as the "service fee," is the largest component of the between $170 million and $260 million in 12b-1 fees paid in total annually by Fund shareholders (comprising well over 50% of the 12b-1 fees paid by Fund shareholders).[1]

---

[1] The mutual fund industry's largest trade association, the Investment Company Institute ("ICI"), surveyed its members in late 2004 concerning how its members used

101.   The remainder of the 12b-1 fee, paid by some classes of Fund shareholders only, is 0.75%, which is a distribution fee principally used to pay commissions.

102.   The 0.75% distribution fee assessed by defendants is the maximum 12b-1 distribution fee permitted by law.

103.   The 0.24% - 0.25% "service fee" pays for "servicing efforts."

104.   "Servicing efforts" include both pre-sale and post-sale shareholder services.

105.   Servicing efforts include some post-sale shareholder services which are not "primarily intended" to result in the sale of Fund shares.

**1.   The Fund Paid For the Maintenance of Mutual Fund Supermarkets on Broker-Dealer Websites When the Brokerage Firms Had a Material Incentive to Maintain the Websites at Their Own Expense**

106.   Defendants used the 12b-1 fees paid by the Fund and its shareholders to finance broker-dealers to maintain mutual fund "supermarkets" on their websites.

107.   A fund supermarket website contains hundreds or even thousands of funds from which a client can choose a purchase.

108.   The purpose of having a website supermarket with many mutual funds is to gain a competitive advantage vis-à-vis other brokerage house supermarket websites which are their competitors.

109.   A broker-dealer with a fund supermarket website has an incentive to include on its website as many mutual funds from as many mutual fund families as

---

12b-1 fees. Its members are mutual funds that manage over 75% of assets nationwide, including the American Funds family (including the Fund), which are subject to 12b-1 fees. The American Fund family responded to the survey. The survey found that over 50 percent of 12b-1 fees paid by ICI member mutual funds were paid not for broker commissions and other pre-sale activities, but rather were paid to provide ongoing services to shareholders *after* their purchase.

possible in order to obtain customers who might otherwise purchase mutual funds from the website of a competing broker-dealer.

110.   These supermarkets are not primarily intended to result in the sale of the shares of any particular mutual fund.

111.   The broker-dealer would have an even greater incentive to include on its website the funds of a large and well-known fund family, such as the Fund as part of the American Funds family of funds.

112.   The broker-dealer would have these incentives to include on its website as many mutual funds from as many mutual fund families as possible, and to include well-known funds and fund families, even if a given mutual fund and/or its fund family did not pay, or paid a lesser amount, to support the website.

113.   This is so because if there are fewer mutual funds and fund families on a given fund supermarket website then that company losses some of its competitive advantage to its competitors who are able to offer its customers a wider selection of fund choices.

114.   It therefore was unnecessary for the Fund to charge near or at the maximum 0.25% service fee or the maximum 0.75% distribution fee to the Fund and its shareholders because the business incentives for the broker-dealer to maintain a fund supermarket with the largest number of funds made it unnecessary for the Fund to pay a 12b-1 fee to support the website or, in any event, to pay such a large 12b-1 fee to support it.

115.   The Fund 12b-1 fees which were paid by Fund shareholders to subsidize mutual fund supermarket websites are excessive and disproportionate to the extent the payments were unnecessary or unnecessarily large in view of the business incentives for the broker-dealers to maintain the fund supermarkets themselves.

**2.      When the Fund's Size Increased, its 12b-1 Fees, Advisory Fees and Total Expenses Grew Substantially More; But, as the Fund's Size Substantially *Decreased*, the Fund's 12b-1 Fees, Advisory Fees and Total Expenses Essentially <u>Remained Unchanged</u>**

116.    From its fiscal year end April 30, 2004 through April 30, 2009, inclusive, the Fund's net assets decreased by approximately 35%, from $66.8 billion to $43.3 billion.

117.    In the same time period, the Fund's 12b-1 fees decreased by only 3.4%

118.    In the same time period, the Fund's advisory fees decreased by only 4.4%.

119.    In the same time period, the Fund's total of 12b-1 fees plus investment advisory fees decreased by only 3.87%.

120.    In the same time period, the Fund's total expenses decreased by only 1.9%.

121.    Prior to the substantial decrease in the size of the Fund in its fiscal year 2009, from April 30, 2004 through April 30, 2008, the Fund's:  net assets increased by approximately 15%; 12b-1 fees increased by approximately 46%; advisory fees increased by approximately 39%; and total expenses increased by approximately 33%.

122.    As the size of the Fund grew, the Fund's expenses grew by much greater proportional amounts, even though the expenses of the investment adviser and underwriter defendants grew at a much lower rate because of the already large size of the Fund and because of economies of scale.  Similarly, the decrease in the size of the Fund did not produce proportional savings.

123.    The increase in the size of the Fund has not produced any meaningful benefits for the Fund and its shareholders.

**3.      The 12b-1 Fees Charged By Defendants Exceeded the <u>Advisory Fees Charged By Defendants</u>**

124.    In each of the Fund's fiscal years from 2004 through 2009, inclusive, the Fund's 12b-1 fees were more than that year's advisory fees.

125.    During its fiscal years 2004-09 inclusive, the Fund and its shareholders

paid a total of **$1.329 billion** in 12b-1 fees.

126.   In the same time period, the Fund and its shareholders paid a total of **$833.6 million** in advisory fees.

127.   Thus, shareholders have been paying more to have the Fund sold to others than to have it managed.

### 4.     The Fund Paid For Services Which the Broker-Dealers Were Legally Obligated to Provide in Any Event

128.   The majority of servicing efforts paid for by the Fund and its shareholders are for post-sale shareholder services.

129.   Post-sale "servicing efforts" include, among other activities, operational and compliance functions with respect to the shareholder's brokerage account, such as providing monthly or quarterly account statements, confirmations of transactions, and suitability analyses of the client's account.  Suitability includes the following activities, among others -- assisting customers in rebalancing their portfolios; reviewing customer holdings on a regular basis; reassessing customer needs and investment strategies, and helping investors generally understand their investments.

130.   The broker-dealer is legally obligated to provide all customers with the post-sale shareholder services described immediately above pursuant to its operations and compliance obligations.

131.   These obligations exist under the applicable statutes and New York Stock Exchange and NASD/FINRA rules and regulations.

132.   The Fund 12b-1 fees which were paid by Fund shareholders for post-sale services are excessive and disproportionate to the extent they were paid for services which the broker-dealer is legally obligated to provide to all its clients who own mutual fund shares, including but not limited to its clients who are shareholders of the Fund.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.**     <u>**The Fund Was Excessively Profitable to the Advisor-Manager**</u>

133.    The information in the chart below was obtained from the Fund's annual reports and statements of additional information for the relevant time periods.

134.    The chart illustrates much of the information contained in the subsections of Section B.

X

Washington Mutual Investors Fund

| All April 30 fiscal yr end | 12b-1 fee ($millions) | Advisory fee ($millions) | Total 12b-1 plus advisory fees | Transfer Agent Fees | Admini-strative Services | Business Mgmt Services | Total Fund expenses $millions | Net Assets in $ billions, fiscal yr end | Total increase in net assets in $billions | $ increase in net assets from performance operations |
|---|---|---|---|---|---|---|---|---|---|---|
| 2004 | 178.9 | 115.9 | 294.9 | 50.1 | 10.8 | 48.4 | 414.7 | 66.800 | 18.5 | -- |
| 2005 | 219.6 | 139.4 | 359.1 | 53.3 | 17.3 | 53.3 | 487.8 | 74.455 | 7.6 | 4.800 |
| 2006 | 240.2 | 149.1 | 389.4 | 53.6 | 19.7 | 55.2 | 509.5 | 79.032 | 4.5 | 14.083 |
| 2007 | 256.4 | 157.4 | 413.9 | 55.0 | 20.9 | 56.6 | 536.7 | 88.180 | 9.1 | 14.179 |
| 2008 | 261.3 | 160.9 | 422.2 | 58.5 | 21.9 | 57.1 | 552.8 | 76.403 | -11.7 | 6.381 |
| 2009 | 172.8 | 110.7 | 283.5 | 60.3 | 17.4 | 46.7 | 406.8 | 43.316 | -33.0 | |
| | 1329.4 | 833.6 | 2163.1 | 331.0 | 108.4 | | 2908.6 | | | |

**1.      The Size of the 12b-1 Fees and the Advisory Fees Increased at An Extraordinary Rate Which Was Out of Proportion to the Increase in Fund Assets**

135.   From April 30, 2004 through April 30, 2008, the Fund's: net assets increased by approximately 15%; 12b-1 fees increased by approximately 46%; advisory fees increased by approximately 39%; and total expenses increased by approximately 33%.

136.   The percentage increase in the dollar amount of the Fund's 12b-1 fees exceeded the percentage growth in the Fund's assets.

137.   The percentage increase in the dollar amount of the Fund's advisory fees exceeded the percentage growth in the Fund's assets.

138.   The percentage increase in the combined dollar amount of the Fund's 12b-1 fees and advisory fees exceeded the percentage growth in the Fund's assets.

139.   The percentage increase in the dollar amount of the Fund's total expenses exceeded the percentage growth in the Fund's assets.

140.   From its fiscal year end April 30, 2004 through April 30, 2009, inclusive, the Fund's net assets decreased by approximately 35%, from $66.8 billion to $43.3 billion.

141.   In the same time period, the Fund's 12b-1 fees decreased by only 3.4%

142.   In the same time period, the Fund's advisory fees decreased by only 4.4%.

143.   In the same time period, the Fund's total of 12b-1 fees plus investment advisory fees decreased by only 3.87%.

144.   In the same time period, the Fund's total expenses decreased by only 1.9%.

145.   For the two fiscal years in which Fund assets decreased, 2008 and 2009 (measuring from the end of fiscal 2007 through the end of fiscal 2009): Fund assets decreased by approximately 50.9% but the Fund's total expenses decreased by only 24.2%.

146.   Thus, the Fund and its shareholders have not been receiving any benefit, regardless of whether the Fund has been growing or decreasing in size.

**2.      The Amount of the 12b-1 Fees and Advisory Fees Charged
By Defendants Were Disproportionate and Excessive in
Comparison to the Fees Charged By Other Funds**

147.   The Windsor II Fund is comparable to the Fund.

148.   As of October 31, 2007, according to its annual report, Form N-CSR, Windsor II had net assets of $54 billion.

149.   For its fiscal year ended October 31, 2007, Windsor II paid distribution fees of $9.6 million; $67.9 million in advisory fees; $70.6 million in management fees, and total expenses of $149.4 million.

150.   The Fund (using April 30, 2008 year-end data) is 41.5% larger (by dollar amount) than the Windsor II Fund.

151.   Even if one increases the dollar amounts of the Windsor II Fund's distribution fees, advisory fees and management fees by a multiple which will account for the difference in size between it and the Fund, Windsor II's fees and expenses would be substantially less than those of the Fund.

152.   As of November 30, 2007, according to its annual report, Form N-CSR, Wellington Fund had net assets of $50.8 billion.

153.   For its fiscal year ended November 30, 2007, the Wellington Fund paid distribution fees of $8.9 million; $27.9 million in advisory fees; $71.7 million in management fees, and total expenses of $109.6 million.

154.   The Fund (using April 30, 2008 year-end data) is 50.4% larger (by dollar amount) than the Wellington Fund.

155.   Even if one increases the dollar amounts of the Wellington Fund's distribution fees, advisory fees and management fees by a multiple which will account for the difference in size between it and the Fund, Wellington's fees and expenses would be substantially less than those of the Fund.

156.   The Dodge & Cox Stock Fund is another comparable fund.

157.   As of December 31, 2007, according to its annual report, Form N-CSR,

Dodge & Cox Stock Fund had net assets of $63.3 billion.

158.   For its fiscal year ended December 31, 2007, Dodge & Cox Stock paid distribution fees of zero; $344.5 million in management fees, and total expenses of $356.6 million.

159.   The Fund (using April 30, 2008 year-end data) is 20.7% larger (by dollar amount) than the Dodge & Cox Stock Fund.

160.   Even if one increases the dollar amounts of Dodge & Cox Stock's management fees and total expenses by a multiple which will account for the difference in size between it and the Fund, Dodge & Cox Stock's fees and expenses would be substantially less than those of the Fund.

161.   The Dodge & Cox International Stock Fund is another comparable fund.

162.   As of December 31, 2007, according to its annual report, Form N-CSR, Dodge & Cox International Stock Fund had net assets of $53.5 billion.

163.   For its fiscal year ended December 31, 2007, Dodge & Cox International paid distribution fees of zero; $267.5 million in management fees, and total expenses of $288.8 million.

164.   The Fund (using April 30, 2008 year-end data) is 42.8% larger (by dollar amount) than Dodge & Cox International.

165.   Even if one increases the dollar amounts of Dodge & Cox International's management fees and total expenses by a multiple which will account for the difference in size between it and the Fund, Dodge & Cox International's fees and expenses would be substantially less than those of the Fund.

166.   As detailed below in Section E, "The Fund's Fee Structure Is Excessive and Disproportionate in Comparison With Other Similar Funds," since the Fund's performance resembles that of an index fund.

167.   Index funds have lower expenses than more actively managed funds, according to the SEC.  SEC, Index Funds, http://sec.gov/answers/indexf.htm  (as of March 9, 2008).

168.   The Vanguard 500 Index Fund is comparable to the Fund.

169.   As of December 31, 2007, according to its annual report, the Vanguard 500 Index Fund had net assets of $121.9 billion.

170.   For its fiscal year ended December 31, 2007, the Vanguard 500 Index Fund paid distribution fees of $23.1 million; $3.3 million in advisory fees; $114.2 million in management fees, and total expenses of $142.2 million.

171.   The Fund's total expenses (using April 30, 2008 data, and without using any multiplier since the Fund is smaller than the Vanguard 500 Index Fund) were almost 300% more than the Vanguard 500 Index Fund's total expenses.

172.   The Vanguard Total Stock Market Index Fund also is comparable to the Fund.

173.   As of December 31, 2007, according to its annual report, the Vanguard Total Stock Market Index Fund had net assets of $106.4 billion.

174.   For its fiscal year ended December 31, 2007, the Vanguard Total Stock Market Index Fund paid distribution fees of $21.8 million; $2.4 million in advisory fees; $74.6 million in management fees, and total expenses of $101.6 million.

175.   The Fund's total expenses (using April 30, 2008 data, and without using any multiplier since the Fund is smaller than the Vanguard Total Stock Market Index Fund) were more than 400% greater than the Vanguard Total Stock Market Index Fund's total expenses.

176.   In 2007, the Fund's total net asset weighted expense ratio was 8.27 times that of a benchmark of all index funds.  Calculated based on data from CRSP Survivor-Bias-Free US Mutual Fund Database ©200809 Center for Research in Security Prices (CRSP®), The University of Chicago Booth School of Business (hereinafter cited as "CRSP").

177.   In 2008, the Fund's total net asset weighted expense ratio was 15.28 times that of a benchmark of index funds for the first nine months of 2008.  CRSP.

178.   The Fund is listed daily in the Wall Street Journal as one of the ten largest

stock funds in America.[2]  Aside from some of the other funds in the American Funds family, the Fund has the highest 12b-1/distribution fees and the highest combined advisory and 12b-1 fees on the list, as the Fund charges near the highest percentages, 0.25% and 1.00%, permitted by law (using 2007-2008 data).

179.   The Fund's advisory fees, the largest part of its profits, were excessive and disproportionate in comparison to these other similar funds.

### 3.   Defendants Received Disproportionate and Excessive Profits As Demonstrated By Defendants Waiver of Certain Business Management and Advisory Fees

180.   Beginning in or about 2004, CRMC has waived part of both the business management and investment advisory fees.

181.   Initially, CRMC waived 5% of each fee.

182.   Beginning in or about 2005, CRMC waived 10% of each fee.

183.   The Fund's Board of Directors, however, did not negotiate this reduction in the excessive fees nor did they negotiate an improved contract for the Fund (nor did they negotiate a reduction or elimination of the 12b-1 fee).

184.   The management and advisory fee waivers are not a permanent reduction in these fees, and may be discontinued by defendants at any time, according to the Fund Prospectus in effect during 2008.  Indeed, it appears this waiver has been purely voluntary and not a reduction negotiated by the Fund's supine Board of Directors.

185.   As detailed above, even with the implementation of the waivers, from April 30, 2004 through April 30, 2008, the Fund's:  net assets increased by approximately 15%; 12b-1 fees increased by approximately 46%; advisory fees

---

[2] The funds other than the American Funds in that group are the Fidelity Contrafund; the Vanguard Total Stock Market Index Fund and the Vanguard 500 Index Fund. The Contrafund does not have a separate 12b-1 fee.  Contrafund's management fee (which includes certain amounts subject to Rule 12b-1), however, is less than the Fund's comparable fees on a dollar for dollar basis.

increased by approximately 39%; and total expenses increased by approximately 33%.

186.   Accordingly, the Fund's 12b-1 fees still have been excessive and disproportionate, as demonstrated by the above percentages, and because economies of scale were not passed on to the Fund and its shareholders (including but not limited to economies of scale based upon additional technology and infrastructure investments by defendants beginning in or around 2005.

187.   According to the March 23, 2009 *Wall Street Journal*, defendants have rescinded their 10% management fee and advisory fee waivers and have unilaterally reinstated the full fees as of January 1, 2009.  Sam Mamudi, Fund Track, "Battered Mutual-Fund Firms To Raise Fees on Shareholders," Wall Street Journal, at C7 (March 23, 2009).  SOAI, July 1, 2009.

188.   Given:  (1) the Fund's performance in the last four and five full fiscal years discussed above and stated in the chart above; (2) the Fund's 12b-1, advisory and other fees, and total expenses, increased slightly from 2007 to 2008 despite a 13.3% decrease in net assets; and (3) the Fund's total expenses decreased by only 24.2% from 2007 to 2009 despite the 50.9% decrease in Fund assets, the rescinding of the waiver provision is creating 12b-1 fees and advisory fees which are even more excessive and disproportionate than the unlawful such fees of prior years.

### C.   The Defendants Received Substantial Fall-Out Benefits

#### 1.   The Marginal Annual Increase in Advisory Fees Constituted Disproportionate and Excessive Fall-Out Benefits Based Upon the Excessive and Unlawful 12b-1 Fees

189.   Fall-out benefits are those benefits other than the particular fee whose legality is being analyzed (here, the 12b-1 fee) that flow to the investment advisor and its affiliates as a result of the relationship between the advisor/affiliates and the Fund, including indirect profits to the defendants attributable in some way to the existence of the Fund.

190.   When considering the lawfulness of the 12b-1 fees paid by the Fund, the

investment advisory fees and transfer agent fees can constitute fall-out benefits to the defendants.

191.   The yearly, marginal dollar increase in advisory fees (starting from the annual dollar amount of advisory fees prior to the damage period) is an excessive fall-out benefit.

192.   These yearly increases in advisory fees each is excessive and disproportionate because each is based upon the unlawful use of the excessive 12b-1 fee to increase Fund assets so as to increase the advisory fee, where there was no reasonable likelihood of a benefit to the Fund and its shareholders from the 12b-1 fees.

193.   In addition, the Fund has a maximum deferred sales charge for Class B shares of 5%.  The Class B shares convert to Class A shares after eight years.

194.   It takes 6.57 years for the defendants to collect enough money from the Fund's 12b-1 fee to pay off the commission earned by the selling broker-dealer at the time of sale. That commission is the 0.76% part of the 12b-1 fee (assuming 5 percent divided by 0.76% equals 6.57 years).

195.   The remaining money collected by defendants from the 12b-1 fee in the ensuing 1.3 years prior to automatic conversion is primarily profit to the defendants and not related to distribution expenses.

> **2.     Fund Shareholders Paid Excessive and Disproportionate 12b-1 Fees Based Upon the Existence of Multiple Classes of the Fund and Multiple Funds Within the American Funds Family, Each of Which Paid for the Same Service Although the Service Was Undivided and Performed Only Once**

196.   In 2007 alone, the approximately 30 funds in the American Funds family of funds and their shareholders together paid a total of over $2 billion in 12b-1 fees to defendants.

197.   Each American Fund mutual fund, including the Fund, charges a separate 12b-1 fee to pay for certain expenses.

198.   Each class of the Fund charges a separate 12b-1 fee to pay for certain expenses.

199.   The 12b-1 fee for each class of the Fund, or for each fund, is used to pay for the same types of activities within each class or within each fund.

200.   Defendants charge each class of the Fund separately for these expenses, even though many of the expenses paid for by the 12b-1 fee are not related to a particular share class or how many different share classes the client owns; are undertaken jointly by the Fund as a whole; cannot be (and in any event are not) apportioned among classes, and are performed only once and the cost is incurred only once by the applicable vendor (usually a broker-dealer).

201.   Similarly, defendants charge each fund (including the Fund) separately for these expenses, even though many of the expenses paid for by the 12b-1 fee are not related to how many separate funds within the American Funds family the client owns; are undertaken jointly among the funds within the American Funds family; cannot be (and in any event are not) apportioned among the funds, and are performed only once and the cost is incurred only once by the applicable vendor.

### a)   Services Which Are Not Divided By Class or by fund

202.   There is only one portfolio of securities purchased by the Fund for all classes of the Fund combined.

203.   Although defendants state that the management fee is applied by class, the management fee is identical for every class of the Fund.

204.   Defendant CRMC employs research analysts who have discretion to make investment decisions, for a portion of a fund's portfolio and for all classes of a given fund (including the Fund) jointly, for a number of the funds within the American Funds family of funds (including the Fund).

205.   These investment analysts employed by CRMC are different individuals than the investment analysts employed by a particular fund, according to the Fund's

1    prospectus.

2        206.   Thus, defendants have an umbrella research effort which uses the same

3    research to make identical investment decisions for a multiple of funds.

4        207.   Other services not divided by class or by fund include (without limitation)

5    account maintenance activities, operational functions, suitability activities, fund

6    supermarket websites and advertising expenses.

7

8        b)    **Shareholders of Each American fund, Including the**

9              **Fund, Are Charged Separately for the Same Service**

10             **Even Though It Is Performed Jointly and Only Once**
             **on Behalf of All American Funds**

11       208.   Many shareholders of the Fund own shares of more than one American

12   Fund, including the Fund, in either one account or in multiple accounts at the same

13   broker-dealer.

14       209.   If one Fund shareholder owns three mutual funds within the American

15   Funds family (including the Fund), and those funds are in one account at a given

16   broker-dealer, the shareholder is charged three times by defendants for account

17   maintenance and operations activities and suitability analyses, even though the broker-

18   dealer prepares and sends to that shareholder only one monthly account statement (not

19   three), and the broker conducts only one suitability analysis for the whole account.

20       210.   If a shareholder of the Fund has more than one account at a particular

21   broker-dealer, the shareholder receives only one combined account statement covering

22   all accounts, and the broker will conduct only one suitability analysis for all the

23   shareholder's investments.

24       211.   If a Fund shareholder owns, in one account, both the Fund and either

25   mutual funds from other fund families or individual stocks (which are unconnected to

26   any fund family), the 12b-1 fee paid by Fund shareholders is paying for shareholder

27   services provided with respect to securities other than the Fund (such as providing for

28   monthly account statements and suitability analyses for the whole account).

212.   Thus, a Fund shareholder who owns both the Fund and other funds within the American funds family, whether in one account or in multiple accounts, is being charged multiple times (once for each Fund) for only one monthly account statement and for one suitability analysis for all the shareholder's investments.

213.   Each class of the Fund is paying an excessive and disproportionate 12b-1 fee for these services, where the "service" or "distribution" expense is not divided by class, and the service is performed only once and the cost is incurred only once by the broker-dealer (and not three times).

214.   Similarly, each of the funds in the American Funds family, including the Fund, is paying an excessive and disproportionate 12b-1 fee for these services, where the "service" or "distribution" expense paid for is not divided by Fund, and the service is performed only once and the cost is incurred only once by the broker-dealer (and not 30 times).

215.   The above analysis concerning being charged multiple times for one service is equally applicable where a shareholder of the Fund owns more than one class of the Fund, whether in the same or multiple accounts.

### 3.   <u>Transfer Agent Fees Also Constitute Fall-out Benefits</u>

216.   Transfer agent fees are calculated as a percentage of net assets under management.

217.   The Fund paid transfer agent fees totaling over $58 million in 2008 and more than $60 million in 2009.

218.   All of the funds in the American Funds family paid to defendants approximately $825 million in transfer agent fees in fiscal 2008.

219.   As with advisory fees, transfer agent fees may constitute an excessive fall-out benefit because:  (1) they derive from the increase in the size of the fund as a result of the excessive 12b-1 fees and (2) as discussed above with respect to multiple classes and multiple funds within the American Funds family, a shareholder of the Fund may

pay multiple times for the same service (with respect to each fund owned by the shareholder) even though the service is only performed once, for example, the maintenance of records of shareholder accounts (and the transfer agent fees may duplicate the 12b-1 fees).

### D.   There Were Economies of Scale Achieved and Such Savings Were Not Passed on to Shareholders

#### 1.   Economies of Scale Were Not Passed on to the Fund and Its Shareholders

220.   Congress enacted Section 36(b) because it believed that, as mutual funds became ever-larger, economies of scale were not being passed on to funds and their shareholders.

221.   Increasing the size of the Fund through the assessment against the Fund and its shareholders of 12b-1 fees is supposed to benefit the Fund and its shareholders by passing along to them savings from the economies in scale created through increasing the size of the Fund.

222.   As the Fund grows larger, economies of scale occur for many Fund activities.

223.   In addition, over time many shareholder services have substantially decreased in cost to defendants because they benefit from the significant increases in computerization (in both back office operations, information technologies and front office trading and sales platforms) and telecommunications in the securities industry in the last quarter century, and the concomitant increase in productivity in the industry. Such services include virtually every operational and compliance issue, obtaining prospectuses on the Internet, trading platforms, the creation of account statements and trade confirmations, computerized telephone records, and analyzing suitability issues and flagging suitability concerns.

224.   These technological advances have benefitted all managers of mutual funds including defendants.

225.   There are additional economies of scale with respect to research for the Fund.

226.   The research cost to conduct a fundamental analysis and technical analysis investigation concerning whether the Fund should make a particular investment in a particular stock, the time and expense involved, remains the same regardless of whether the size of the investment would be for millions of dollars or hundreds of millions of dollars.

227.   The Fund also has other economies of scale concerning research costs because of the separate CRMC research analysts whose expense is apportioned among the funds in the American Funds family.

### 2.   The Fund's 12b-1 Fees and Advisory Fees Increased Faster Than Its Net Assets

228.   From its fiscal year end April 30, 2004 through April 30, 2009, inclusive, the Fund's net assets decreased by approximately 35%, from $66.8 billion to $43.3 billion.

229.   In the same time period, the Fund's 12b-1 fees decreased by only 3.4%

230.   In the same time period, the Fund's advisory fees decreased by only 4.4%.

231.   In the same time period, the Fund's total of 12b-1 fees plus investment advisory fees decreased by only 3.87%.

232.   In the same time period, the Fund's total expenses decreased by only 1.9%.

233.   Prior to the substantial decrease in the size of the Fund in its fiscal year 2009, from April 30, 2004 through April 30, 2008, the Fund's:  net assets increased by approximately 15%; 12b-1 fees increased by approximately 46%; advisory fees increased by approximately 39%; and total expenses increased by approximately 33%.

234.   The percentage increase in the dollar amount of the Fund's 12b-1 fees, advisory fees, such fees combined, and total expenses, exceeded the percentage growth in the Fund's assets.

235.   The Defendants, and not the Fund and its shareholders, benefitted from the

changes in the size of the Fund, which provided to defendants a huge windfall from the fees paid to defendants by the Fund and its shareholders.

### 3. The Fund's Investment Advisory Fee Breakpoints Did Not Confer a Material Benefit Upon Shareholders With Respect to the 12b-1 Fees Paid By Them

236.   During the Fund's fiscal years 2004 through 2009, inclusive, the Fund's total investment advisory fees were *more than $883 million*.

237.   During the Fund's same fiscal years, the Fund's Total 12b-1 fees were *more than $1.329 billion*.

238.   Taken together, Fund shareholders paid approximately ***$2.163 billion*** total in advisory fees and 12b-1 fees for the years 2004-09 inclusive.

239.   The Fund's agreement with the investment advisor provides for a very slight scale-down in advisory fees as the Fund grows larger.

240.   The percentage of the 12b-1 fee did not decrease as the amount of assets in the Fund increased.

241.   The total savings for the Fund from the investment advisory fee breakpoints for Fund assets over $1 billion for fiscal year 2008, was, upon information and belief, less than $10 million compared to the more than $261 million in 12b-1 fees paid/accrued by the Fund and its shareholders for fiscal year 2008.  The savings was even smaller for fiscal 2009 (assuming $43 billion in Fund assets).

242.   For prior years, upon information and belief, the savings from any breakpoints averaged less than $5 million annually.

243.   Thus, in contrast to the total 12b-1 fees paid in this six year period of more than ***$1.329 billion***, the total breakpoint savings during the same time period was substantially less than $30 million.

244.   These miniscule breakpoint savings passed along to the Fund and its shareholders were immaterial in comparison to the approximately $1.329 billion paid by the Fund and its shareholders in 12b-1 fees and the more than $883 million paid in

1  advisory fees.

2      245.   Beyond the sheer numbers, academic studies suggest that breakpoints do

3  not capture the economies of scale.  Freeman & Brown, Mutual Fund Advisory Fees:

4  The Cost of Conflicts of Interest, The Journal of Corporation Law 609, 619-27 (2001).

5

6      **4.**    **The Extraordinary Increase in the Size Of The Fund**

7          **Through the Use of 12b-1 Fees Created Diseconomies of**
        **Scale Which Undermined Defendants Ability to Obtain**

8          **<u>Above-Average Returns</u>**

9      246.   One of two things happens when a fund's asset base grows.  If, as is the

10  case here, it is a large cap fund, it "morphs" over time into an expensive index fund.  If

11  it is a small cap fund, the manager's ability to pursue the small cap strategy is impeded,

12  according to Shannon Zimmerman, an investment analyst with The Motley Fool, a

13  well-known and respected Internet service which gives investment advice, particularly

14  to retail investors.

15      247.   The distributor sets the 12b-1 fees to increase compensation to the broker-

16  dealer by selling more fund shares.  This drives up the cost to investors.  The selling of

17  those fund shares also continually drives up the cost to shareholders, regardless of how

18  large the fund becomes, because the increase in the advisory fee continually outpaces

19  the increase in economies of scale.  "Fund shareholders are paying the costs to grow the

20  fund, while the fund adviser is the primary beneficiary of the fund's growth," according

21  to Barbara Roper, Director of Investor Protection, Consumer Federation of America.

22  The Acid Test: Does Rule 12b-1 Benefit Mutual Fund Shareholders? (The Mutual Fund

23  Distribution Expense Mess), cited in John P. Freeman, The Journal of Corporation Law

24  (June 2007).

25      248.   Thus, even if a large fund continues to achieve economies of scale at the

26  margin, the cost of the 12b-1 plan to shareholders far exceeds the benefits of the plan

27  derived from these marginal economies of scale in an already large fund, and these

28  benefits are no larger material in a fund the size of the Fund.  Coates & Hubbard,

Competition in the Mutual Fund Industry:  Evidence and Implications for Policy, 33 Iowa J. Corp. L. 151, 189-193, 193 & notes (2007).

249.   Given the already huge size of the Fund, further growth in the Fund does not generate additional material financial benefits to the Fund and its shareholders from economies of scale sufficient to offset the cost to them in 12b-1 fees of more than $170 million per year.

250.   The only beneficiaries of this huge increase in fund assets under management, which resulted from using part of the 12b-1 fee to increase distribution of the shares, were the defendants.  They reaped a materially larger advisory fee and materially increased Transfer Agent fees merely based upon the increase in the size of the Fund, an increase in size which the Fund and its shareholders paid $170 million to $260 million per year to finance but received no benefit therefrom.

251.   The directors of the Fund should either have closed the Fund to new investors to limit the growth of the Fund so that the Fund could be actively managed, or if the Fund was not closed and was permitted to grow (as has been the case), then the directors should have eliminated or at least dramatically lowered the 12b-1 fee, and should have dramatically lowered the advisory fee.

**a)**      **The Directors Did Not Close the Fund**

252.   The typical mutual fund owns 160 stocks, and probably should own a substantial number less than that in order to maximum performance while minimizing risk.  Christopher W. Mayer, "The Art of Fund Management, July 9, 2008.

253.   Most funds have official or unofficial limits on how much of any one security can be in a fund.

254.   Such limits undermine maximum performance because they force the advisor to purchase additional stocks beyond the initial group of stocks which the advisor thinks will increase the most in share price.

255.   Whether or not a fund has such limits, however, for a very large fund such as the Fund (whether or not it continues to increase in size), the fund must find more

and more stocks its adviser hopes will increase in share price.

256.    A fund's large size undermines the ability to obtain above-average returns because the number of stocks available for a fund's portfolio decreases.  John C. Bogle, Common Sense on Mutual Funds 265 (John Wiley & Sons 1999).

257.    As the fund's investments expand to include more stocks, there are fewer and fewer superior stocks, because the stocks the fund thought would increase the most would be the fund's first purchases.  John Waggoner, "Some Mutual Funds' Success Has Supersized Them,"  USA Today, Jan. 19, 2007.

258.    The Fund's portfolio followed this pattern.

259.    As of mid-2009, The Fund was approximately the 10th largest mutual fund in the United States, with approximately $43 billion in net assets.

260.    As of March 31, 2009, its top ten holdings totaled 31.1% of the Fund's assets (Morningstar.com website), with Chevron Corporation the largest holding, and one of only three holdings over three percent of the Fund's assets, at 5.12% of Fund net assets.

261.    Similarly, the American Funds family has grown so large (having had as much as almost $1 trillion under management at any one time, among all its funds, during the last few years) that many of its funds have large portfolio positions in the same companies.

262.    For example, The Growth Fund of America is the largest fund in the American Funds family and one of the two largest mutual funds in the United States.

263.    Three of the Fund's 19 largest holdings are also among the Growth Fund of America's 19 largest holdings (United Parcel, McDonald's and J.P. Morgan).

264.    Another large mutual fund in the American Funds family is Capital World Growth & Income Fund.

265.    As of March 31, 2009, three of the Fund's seven largest holdings were also among Capital World G&I's 14 largest holdings (AT&T, Verizon and Coca-Cola).

266.    Another large mutual fund in the American Funds family is Capital

Income Builder.

267.   As of March 31, 2009, seven of the Fund's 21 largest holdings were also among Capital Income Builder's 22 largest holdings (AT&T, Royal Dutch, Verizon, Exelon, Coke, Bristol-Myers and PPL).

268.   A fourth large mutual fund in the American Funds family is Fundamental Investors Fund.

269.   As of March 31, 2009, seven of the Fund's 24 largest holdings were also among Fundamental Investors 21 largest holdings (AT&T, Verizon, McDonald's, Eli Lilly, J.P. Morgan, US Bancorp and Wal-Mart).

270.   A fifth large mutual fund in the American Funds family is The Income Fund of America.

271.   As of March 31, 2009, ten of the Fund's 20 largest holdings were also among The Income Fund of America's 19 largest holdings (Chevron, AT&T, Verizon, Coca-Cola, McDonald's, Intel, Eli Lilly, Kraft, Bristol-Myers and Entergy).

272.   Because of its large holdings of individual securities across multiple American Funds, including the Fund; because CRMC has research analysts who make investment decisions simultaneously across multiple funds in the American Funds family, and given the size of the funds in the American Funds family, a fund the size of the Fund can have trouble selling a security without causing the price to fall. John Waggoner, "Some Mutual Funds' Success Has Supersized Them," USA Today, Jan. 19, 2007.  This negative impact is exacerbated through continual increases in the size of the fund as a result of charging excessive 12b-1 fees.

273.   Fidelity's former flagship fund, the Magellan Fund, was one of the largest mutual funds in the United States.  It became so large that it closed to new investors in 1997.  Magellan reopened to new investors effective January 2008, when it had approximately $38 billion in assets, which was (upon information and belief) less than half the amount of money it held at its peak.  The Boston Globe, Boston.com, by Ross Kerber Globe Staff, January 15, 2008.

274. The directors did not close the Fund.

**5. A Number of the American Funds Utilized Common Research Analysts and Performed Like Index Funds, All of Them Doing So in Relation to Their Common Index, Both of Which Should Have Decreased Costs and Generated Economies of Scale**

275. As detailed above, part of the research for funds in the American Fund family is performed by research analysts employed by CRMC and not by each Fund.

276. These analysts make investment decisions for more than one fund including the Fund.

277. Common research analysts would result in the Fund acting more like an index fund because its performance would be closer to a mean or an average.

278. As the Fund has grown, its performance increasingly resembled that of an index fund.

279. As detailed below in Section E, "The Fund's Fee Structure Is Excessive and Disproportionate in Comparison With Other Similar Funds," the Fund has a 3-year trailing R-Squared of 98 measured against the S&P 500 Total Return Index (Morningstar.com, password not required).

280. Thus, the Fund has performed largely as an index fund for at least the past three years.

281. Other American Funds have similar R-Squared measurements to the Fund when tested against the same index.

282. Growth Fund of America has a 93 R-Squared measured against the S&P 500 Total Return Index.

283. Fundamental Investors Fund has a 94 R-Squared measured against the S&P 500 Total Return Index.

284. These funds presumably have different investment objectives (the investment objective for each fund is stated in their prospectus), so their investments

and R-Squared should not be that similar when measured against the same index.

285.   The Fund and these other funds acted like index funds and were passively managed in material part.

286.   Common research analysts and passive management as an index fund would create additional economies of scale.

### E.   The Fund's Fee Structure Is Excessive and Disproportionate in Comparison With Other Similar Funds

287.   A General Accounting Office study found that mutual fund firms generally do not attempt to compete on the basis of fees (and so the mutual funds accept the fees and coverage sought by the broker-dealer and do not even attempt to negotiate lower fees with the broker-dealer).   Mutual Fund Fees:   Additional Disclosure Could Encourage Price Competition, General Accounting Office, Rpt. No. GGD-00-126 at 62 (June 2000).

288.   The GAO Report found that fund boards "may be keeping fees at higher levels because of [a] focus on maintaining fees within the range of other funds."  GAO Rpt. at 8. Palmiter, The Mutual Fund Board: A Failed Experiment in Regulatory Outsourcing, 1 Brook. J. Corp. Fin. & Com. L. 165, 192 (2006) (citing sources).

289.   During 2007 – 2009, inclusive, the Fund was one of the ten largest mutual funds ranked by dollar assets, with between $88 billion and $43 billion in assets.

290.   The American Funds family of funds is one of the largest fund families in the nation.

291.   The Fund charged either very near the maximum, or the maximum, 12b-1 service fee permitted by law (depending on the class), 0.25%.

292.   The Fund charged the maximum 12b-1 distribution fee permitted by law, 0.75%, with respect to most of its classes.

293.   The Fund's 12b-1 fees were materially higher than those of other comparable funds.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.   The 12b-1 Fees Charged By Defendants Were Excessive and Disproportionate in Comparison to the 12b-1 Fees Charged By Other Comparable Funds Which Were Not Index Funds

294.   The Fund's 12b-1 fees were disproportionately higher in relation to its advisory fees than comparable funds which were not index funds.

295.   Shareholders of the Fund have been paying more to have the Fund sold to others than to have it managed.

296.   In its 2009 fiscal year, the Fund's distribution fees were 156% of its advisory fees ($172.8 million in 12b-1 fees versus $110.7 million in advisory fees).

297.   In its 2008 fiscal year, the Fund's distribution fees were 162% of its advisory fees ($261.3 million in 12b-1 fees versus $160.9 million in advisory fees).

298.   In its six fiscal years 2004 through 2009, inclusive, the Fund's distribution fees were 159% of its advisory fees ($1.329 billion in 12b-1 fees versus $833.6 million in advisory fees).

299.   For its fiscal year ending October 31, 2007, the Windsor II Fund's distribution fees were only 14% of its advisory fees ($9.6 million in distribution fees versus $67.9 million in advisory fees) and were only 6.9% of its advisory and management fees combined ($9.6 million in distribution fees versus $138.5 million in advisory and management fees).

300.   For its fiscal year ending November 30, 2007, the Wellington Fund's distribution fees were only 31.9% of its advisory fees ($8.9 million in distribution fees versus $27.9 million in advisory fees) and were only 8.9% of its advisory and management fees combined ($8.9 million in distribution fees versus $99.6 in advisory and management fees combined).

301.   For their respective 2008 fiscal years, the ratio of distribution fees to advisory fees for the Windsor II and Wellington Funds was roughly the same, and still materially lower than the ratio for the Fund.

302.   The excessiveness of the Fund's 12b-1 fees in relation to comparable funds, as demonstrated by the much higher percentage of the Fund's 12b-1 fees in

relation to its advisory fees, has been exacerbated by the fact that the Fund's advisory fee in total dollars is materially greater than the dollar amount of the advisory fees of other funds, thus increasing the multiplier effect of the higher percentage of 12b-1 fees.

303.   In other words, unlike the Fund, other very large funds have been charging distribution fees which were materially lower than their advisory fees.

304.   As of mid- 2007, the Fund's 12b-1 fee (in dollars, at that time over $256 million annually) was larger than the 12b-1 fee for all other mutual funds in the United States which were not in the American Funds family of funds.

305.   Upon information and belief, during 2008, the Fund's 12b-1 fee (in dollars) also was larger than the 12b-1 fee for all other mutual funds in the United States which were not in the American Funds family (except possibly for two funds). See Morningstar.com.

### 2.   The Fund Acted Like an Index Fund, But Defendants Charged 12b-1 Fees as if the Fund Were Actively Managed, and Those 12b-1 Fees Were Excessive in Comparison to Index Funds

306.   The Fund's performance is almost identical to that of an index fund.

307.   A fund's "R-squared" figure is a measure of a fund's movement against its particular benchmark index on a scale ranging from 1 to 100.  An S&P 500 index fund will have an R-squared number very close to 100 because the fund mirrors the index. "A number above 90 indicates that it's pretty close to the S&P index [or the particular index used as a comparison to the fund]."  Russel Kinnel, *Fund Spy:  How to Diversify With Big Funds*, Sept. 9, 2002. (at Morningstar.com).

308.   The Fund has a 3-year trailing R-Squared of 98 measured against the MSCI EAFE Index.  (Morningstar.com, password not required).

309.   Thus, the Fund has performed essentially as an index fund for at least the past three years.

310.   The Fund has a Beta of 0.92 when measured against the S&P 500 Total

Return Index.

311.   In its 2009 fiscal year, the Fund's distribution fees were 156% of its advisory fees ($172.8 million in 12b-1 fees versus $110.7 million in advisory fees).

312.   In its 2008 fiscal year, the Fund's distribution fees were 162% of its advisory fees ($261.3 million in 12b-1 fees versus $160.9 million in advisory fees).

313.   In its six fiscal years 2004 through 2009, inclusive, the Fund's distribution fees were 159% of its advisory fees ($1.329 billion in 12b-1 fees versus $833.6 million in advisory fees).

314.   For its fiscal year ending December 31, 2007, the Vanguard 500 Index Fund's distribution fees were only 19.7% of its advisory and management fees combined ($23.1 million in distribution fees versus $117.5 million in advisory and management fees).

315.   For its fiscal year ending December 31, 2007, the Vanguard Total Stock Market Index Fund's distribution fees were only 28.3% of its advisory and management fees combined ($21.8 million in distribution fees versus $77.0 million in advisory and management fees).

316.   For its fiscal year ended October 31, 2007, the Vanguard European Stock Index Fund's distribution fees were only 16.6% of its advisory and management fees combined ($7.0 million in distribution fees versus $42.176 million in advisory and management fees).

317.   For its fiscal year ended October 31, 2007, the Vanguard Pacific Stock Index Fund's distribution fees were only 17.5% of its advisory and management fees combined ($3.4 million in distribution fees versus $19.4 million in advisory and management fees).

318.   Thus, shareholders of the Fund have been paying more to have the Fund sold to others than to have it managed.

319.   The following chart, using information taken from each of the fund's SEC filings, shows the distribution fees for each fund per million dollars in net assets under

management:

| Fund Name | Fund Category | Distribution fee (millions) | Net assets (billions) | Distribution fee per $million under management |
|---|---|---|---|---|
| Washington Mutual Investors  2009 | Large Value | $172.827 | $43.316 | $3,989 |
| Washington Mutual Investors 2008 | Large Value | $261.321 | $76.403 | $3,420 |
| Vanguard 500 Index 2008 | Large Blend | $24.5 | $74.9 | $327 |
| Vanguard Total Stock Market Index 2008 | Large Blend | $25.679 | $81.9 | $314 |
| Windsor II (not an index fund)  2008 | Large Value | $9.5 | $31.0 | $306 |
| Wellington (not an index fund)  2008 | Large Value | $10.64 | $37.2 | $286 |
| Vanguard European Stock Index  2007 | | $7.0 | $26.2 | $267 |
| Vanguard Total Stock Market Index 2007 | Large Blend | $21.8 | $106.4 | $205 |
| Vanguard Pacific Stock Index | | $3.4 | $17.0 | $200 |
| Vanguard 500 Index 2007 | Large Blend | $23.1 | $121.9 | $189 |
| Windsor II (not an index fund)  2007 | Large Value | $9.6 | $54.0 | $178 |
| Wellington (not an index fund)  2007 | Large Value | $8.9 | $50.8 | $175 |
| Dodge & Cox Stock 2008 | Large Value | zero | $32.72 | zero |
| Dodge & Cox Stock 2007 | Large Value | zero | $63.29 | zero |
| Dodge & Cox International 2007 | Foreign Large Value | zero | $53.5 | zero |
| Dodge & Cox International 2008 | Foreign Large Value | zero | $25.0 | zero |

320.   In comparing the Fund's April 30, 2009 data to other Funds' 2008 data, the Fund's distribution fee per million dollars under management was more than 12 times greater than each of the other comparable funds.

321.   In comparing the Fund's April 30, 2008 data to other Funds' 2008 data, the Fund's distribution fee per million dollars under management was more than 10 times greater than each of the other comparable funds.

322.   In 2007, the Fund's total net asset weighted 12b1- fee (the dollar amount of 12b-1 fees paid to total net assets) was 12.28 times that of a benchmark of index funds.  CRSP.

323.   In 2008, the Fund's total net asset weighted 12b-1 fee was 25.70 times that of a benchmark of index funds (for the first nine months of 2008).  CRSP.

## F.   The Independence and Conscientiousness of the Mutual Fund's Outside Directors

324.   The United States Supreme Court has held that independent directors on a mutual fund board are supposed to be "independent watchdogs." *Burks v. Lasker*, 441 U.S. 471, 484 (1979).

325.   This has not been the case with the Fund.

326.   The investment advisor controls the information which reaches the so-called independent directors of the Fund, undermining their statutory duties as "independent watchdogs" and undermining the presumption under the ICA that a director is not a controlled person.

327.   CRMC controls:  (1) the information which is given to the independent directors; (2) the agenda of board meeting; (3) the materials prepared and presented at board meetings; (4) who presents items at board meetings, and (5) who is involved in advising the independent directors.

**1.    The Fund's Board Breached Its Fiduciary Duty By Continually Approving the Fund's 12b-1 Plans With Virtually No Time Given to Their Consideration and Because There Is No Reasonable Likelihood That the Millions of Dollars of 12b-1 Fees Paid By the Fund and Its Shareholders <u>Will Benefit The Fund and Its Shareholders</u>**

328.    As set forth in the earlier section of this pleading concerning non-parties related to the defendants, the Fund has a Board of Directors who have been elected by the shareholders only twice in a decade, who rarely meet, whose focus is spread over many different funds in the American family of funds, and who receive material compensation from the American family of funds.

329.    All but one of the so-called independent Directors of the Fund sits on more than one board of directors of mutual funds within the American Fund family and their respective Contracts Committees/Subcommittees.

330.    These common board members meet simultaneously as the boards of those funds.

331.    The Governance Committee of the Fund held only one meeting during each of the 2007 through 2009 fiscal years, which was held simultaneously, or *seriatim* on the same day, with the meetings of the Contracts Committees/Subcommittees of the other funds within the American family of funds.

332.    The statute and SEC rules require a board of directors to make certain findings and to come to certain, separate conclusions concerning the continuation of each plan of distribution.

333.    Given that the Contracts Subcommittee of the Fund held only one meeting during the fiscal year, which was held simultaneously, or *seriatim* on the same day, with the meetings of the Contracts Committees of other funds within the American family of funds, and using an eight hour workday to make a calculation, the Contracts Subcommittee of the Fund would have spent materially less than two hours total considering all of the Fund's many plans of distribution combined.

334.    Given that the boards of directors of the Fund and the other funds within

the American Funds family met simultaneously as the boards of those funds, and even using an eight hour workday to make a calculation, the Board of Directors of the Fund would have spent less than two hours total considering all of the Fund's many plans of distribution combined.

335.   Given the number of Contracts Committees/Subcommittees and Boards which, respectively, were meeting during one day, the Governance Committee, Contracts Subcommittee and Board of the Fund must have, for 2009 (and for each year, for a number of years, prior to 2009) spent an immaterial amount of time considering the Fund's Plans of Distribution.

336.   In this limited amount of time, the Contracts Subcommittee of the Fund, as well as the Board of the Fund, could not possibly have examined in any meaningful way, as required by their fiduciary duty, the factors for continuing each 12b-1 Plan of Distribution, and were limited simply to acting year after year as a rubber stamp for the proposals of defendants regarding 12b-1 fees.

337.   Hence, the Fund's Contracts Subcommittee and Board gave the Fund's 12b-1 Plans only a perfunctory and not the careful consideration required as to whether the plans should be continued.

338.   The very fact that the Fund's shareholders for a number of years have been paying hundreds of million of dollars per year, now between $170 million and more than $260 million per year, in 12b-1 fees, on top of paying approximately $110 million to $150 million a year in investment advisory fees, while receiving an immaterial benefit of a few million dollars per year in advisory fee breakpoints, in itself demonstrates the Board's failure to give the legally required consideration to its annual approval for continuation of the Fund's 12b-1 Plans.

339.   For the reasons set forth in detail above, the plans have, for at least a number of years, provided no benefits to the Fund or its shareholders.

340.   Indeed, the fact that all the funds in the American Funds family charge similar 12b-1 fees and advisory fees is further evidence that the board of directors does

not consider the circumstances of each fund they oversee individually but, rather, treat them as a group in breach of their fiduciary duties to the Fund and its shareholders.

### 2. The Fund's Board Did Not Fulfill Its Fiduciary Duty When It Failed to Engage in Arms-Length Bargaining

#### a) The Board Failed to Negotiate Lower 12b-1 Fees

341. Despite the large size of the Fund and of the American Funds family overall, and despite the tremendous increases in computerization and productivity, when negotiating with broker-dealers the size of its 12b-1 fees, the Funds' independent Directors have not sought to obtain, and have not obtained, any benefits for the Fund and its shareholders including but not limited to:

A reduction in 12b-1 fee percentages paid by the Fund. The Fund pays the maximum service fee permitted by law and the maximum distribution fee permitted by law.

A limitation on the activities for which the 12-1 service fee is paid. The Fund current pays 12b-1 fees for services which the broker-dealer is legally obligated to provide in any event.

The Fund current pays 12b-1 fees for services which are not "primarily intended" to result in the sale of Fund shares.

A limitation on the distribution fee for broker commissions.

The 12b-1 fee distribution fee benefits only a mutual fund which does not yet have a foot-hold in the marketplace. The fee does not benefit a mutual fund, such as the Fund, which already is established in the marketplace, according to Richard Phillips, law firm senior partner and former SEC official who participated in the SEC Roundtable.

The amount of the 12b-1 fee for broker compensation is less relevant to increasing Fund sales than the types of funds which the fund family sells and the client is interested in purchasing.

The size of the Fund as well as of the American Funds family of funds gives the Board the ability to seek and obtain materially lower costs from the broker-dealers which should be passed on to the Fund and its shareholders.

The Fund and its shareholders pay very high 12b-1 fees for a performance record which essentially is that of an index fund.

Economies of scale were present, but the Board failed to pass along those economies to the Fund and its shareholders.

342.   The Board had available to it the data necessary to determine whether, with respect to the continuation of the 12b-1 fees, the 12b-1 plans were reasonably like to result in material benefits to the Fund and its shareholders.

343.   The allegations here demonstrate that the 12b-1 fees have been so disproportionately large that they bear no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining (both between the defendants and the Fund's board and between broker-dealers and the Fund's board).

344.   The 12b-1 agreements approved by the Board have resulted in excessive and disproportionate service fees and distribution fees.[3]

345.   A number of the separate criteria in the SEC Release adopting Rule 12b-1 are address below.  Investment Company Act Release No. 11414.

_____

[3] There are some types of expenses which still may be *per se* unlawful.  Section 12 of the ICA makes it unlawful for any mutual fund to act as a distributor of securities of which it is the issuer, except to the extent the mutual fund comes within the limited exception under Rule 12b-1.  The permitted exception under Rule 12b-1 states that it is lawful to use 12b-1 fees only to "finance[] any activity which is ***primarily intended*** to result in the sale of shares issued by such company, including, but not necessarily limited to, advertising, compensation of underwriters, dealers and sales personnel, the printing and mailing of prospectuses ***to other than current shareholders***, and the printing and mailing of sales literature."  (emph. added).  Thus, it would, for example, make little sense to require that the Gartenberg Factors be applied to the printing and mailing of prospectuses to current shareholders.

### G.   There Are No Problems or Circumstances Which Make the Continuation of the 12b-1 Plan Necessary or Appropriate

346.   As of mid-2007, the Fund was one of the ten largest funds in the United States, with approximately $80 billion in assets.

347.   Even with the decline in the market since that time, the Fund is still one of the ten largest funds in the United States.   (Morningstar.com, password required, obtained on July 17, 2009; Wall Street Journal, July 25, 2009).

348.   The American Funds family of funds still is the second largest fund family in the United States.

349.   The Fund and the fund family have not had a problem with respect to net redemptions.

350.   The Fund and the fund family do not have a current problem with respect to net redemptions.

351.   The Fund does not have a problem with respect to its ability to finance advertising expenditures.

### H.   For a Number of Years, the Plan Has Not Produced Benefits for the Fund and its shareholders

352.   Defendants are not passing on to the Fund and its shareholders the economies of scale created by the increase in the size of the Fund.

353.   The only material beneficiaries to further increases in the size of the Fund are defendants, who reaped ever larger advisory and other fees for managing the Fund.

354.   For all of the reasons stated above, the Fund's 12b-1 plans, for a number of years, have been highly lucrative for defendants -- gaining them millions per year in additional advisory, transfer agent and other fees -- but have provided no benefits whatsoever for the Fund and its shareholders.   (The remainder of the nine criteria contained in the SEC Release essentially are duplicative of the *Gartenberg* Factors.)

## II.   THE INVESTMENT ADVISORY FEES ARE EXCESSIVE AND DISPROPORTIONATE

355.   Whether advisory fees are excessive and disproportionate is governed by the same six "*Gartenberg* Factors."

356.   Virtually all of the above analysis with respect to 12b-1 fees is applicable to the investment advisory fee analysis.

357.   The above allegations are incorporated by reference as if fully set forth in Section II of this amended complaint.

358.   A few of the above allegations are summarized below.

### A.   The Nature and Quality of the Services Provided By the Adviser to the Shareholders

359.   As discussed in the 12b-1 section of this pleading, for a number of years the Fund's performance has been almost identical to that of an index fund.

360.   The Fund has had an R-Squared of at least 98 for the past three years.

361.   Nevertheless, the Fund has charged advisory fees as if it were an actively managed fund.

### B.   The Fund Was Excessively Profitable to the Advisor-Manager

362.   When measured against comparable funds (see above), the Fund's advisory fees were a multiple of what they should have been for a fund which essentially was an index fund.

363.   In 2007, the Fund's total net asset weighted expense ratio was 8.27 times that of a benchmark of all index funds.  CRSP.

364.   In 2008, the Fund's total net asset weighted expense ratio was 15.28 times that of a benchmark of index funds for the first nine months of 2008.  CRSP.

365.   Even when compared to funds which were not index funds, the Funds' advisory fees were excessive and disproportionate.  Section I.B. above.

366.   Accordingly, in comparison to the management fees of comparable funds

(stated for the most part in Section I.B. above), the Fund's advisory fees were excessive and disproportionate to the extent of hundreds of millions of dollars.

## C.    The Defendants Received Substantial Fall-Out Benefits

### 1.    The 12b-1 Fees and Transfer Agent Fees Constituted Disproportionate and Excessive Fall-Out Benefits Based Upon the Excessive and Disproportionate Advisory Fees

367.    Fall-out benefits are those benefits other than the particular fee whose legality is being analyzed (here, the advisory fee) that flow to the investment advisor and its affiliates as a result of the relationship between the advisor/affiliates and the Fund, including indirect profits to the defendants attributable in some way to the existence of the Fund.

368.    When considering the lawfulness of the advisory fees paid by the Fund, the 12b-1 fees and transfer agent fees can constitute fall-out benefits to the defendants.

369.    The purpose of 12b-1 fees is to promote the sale of Fund shares.

370.    Increases in the size of the Fund in turn increase Fund assets and advisory fees and transfer agent fees.

371.    Defendants received increased advisory fees as a result of the increase in the size of the Fund, but did not pass on to the Fund and its shareholders the benefits of any economies of scale, and did not lower the Fund's excessive 12b-1 fees.

372.    Similarly, the Fund and its shareholders paid to defendants $58.5 million in transfer agent fees in fiscal 2008 and $60.3 million in 2009.

373.    All of the funds in the American Funds family paid to defendants approximately $825 million in transfer agent fees in fiscal 2008.

374.    Increases in transfer agent fees are based upon increases in the size of the Fund.

375.    As the Fund increases in size, a transfer/subtransfer agent will obtain increasing economies of scale with respect to recordkeeping for the Fund's shareholders (which are not being passed on to shareholders because the transfer agent

fee is a percentage of net assets) and because Fund/class shareholders are paying multiple times for a service (account maintenance) which is performed only once (as discussed above).

### D. There Were Economies of Scale Achieved and Such Savings Were Not Passed on to Shareholders

376.   As set forth in Section I.D., there were economies of scale.

377.   The economies of scale were not passed on to the Fund and its shareholders.

378.   The Fund's advisory fees increased faster than its net assets.

379.   Advisory fee breakpoints did not confer any material benefits upon the Fund and its shareholders.

380.   The increase in the size of the Fund created diseconomies of scale.

381.   The Fund performed like an index fund but charged advisory fees as if it were actively managed.

### E. The Fund's Fee Structure Is Excessive and Disproportionate in Comparison With Other Similar Funds

382.   Mutual funds generally do not attempt to compete on the basis of fees. General Accounting Office Study (above).

383.   As set forth in Sections I.B. and I.E. above, the Fund's advisory fees are materially greater than the advisory fees of other comparable funds, both other stock funds and index funds.

384.   Advisory fee breakpoints did not confer any material benefits upon the Fund and its shareholders.

385.   The Fund's advisory fees are excessive and disproportionate when viewed against the advisory fees of comparable funds.

### F.   The Independence and Conscientiousness of the Mutual Fund's Outside Directors

386.   The allegations stated above (principally in Sections I.B. and I.F.) which include but are not limited to the allegations concerning the size of the advisory fees charged the Fund, the failure to pass on economies of scale to the Fund and its shareholders, the board's approval of advisory fee breakpoints which provided no material benefit to the Fund and its shareholders, the board of directors involvement in and knowledge of the facts concerning 12b-1 fees, and the board's failure to negotiate materially lower 12b-1 fees on behalf of the Fund and its shareholders, all are equally applicable to the board's knowledge and involvement concerning advisory fees, and the board's conduct with respect to advisory fees including its failure to negotiate materially lower investment advisory fees with defendants.

387.   The Board had available to it the data necessary to determine whether the advisory fees were excessive and disproportionate.

388.   The Fund's independent directors have not sought to obtain, and have not obtained, a reduction in the advisory fee paid by the Fund.

389.   The Fund's investment advisory fees were excessive and disproportionate given the facts and circumstances including but not limited to when viewed against the advisory fees of other comparable funds.


### Incorporation of the Fund's SEC Filings and Other Documents

390.   The following SEC filings made by the Fund, and any and all amendments thereto, are incorporated herein by reference:  (1) The Fund's annual reports, semi-annual reports, registration statements, N-CSRs, prospectuses and Statements of Additional Information, filed with the SEC beginning with January 1, 2001 through the date of the commencement of this action, and (2) all 12b-1 Plans of Distribution and filings concerning the implementation or continuation of the Plan for each class of the Fund; and (3) all filings and other documents specifically identified herein.

**FIRST CLAIM FOR RELIEF**
**For Violation Of §36(b) of the ICA, against AFD and CRMC**

391.   Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

392.   The defendant in this claim is AFD, the distributor of the Fund, which is both the principal underwriter of the Fund and an affiliated person of defendant investment adviser CRMC.

393.   CRMC is also a defendant on this claim to the extent it received advisory fees, transfer agent and other fees which were excessive and disproportionate fall-out benefits based upon the excessive and disproportionate 12b-1 fees.

394.   Pursuant to Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), the investment adviser, principal underwriter, directors and officers of a mutual fund owe to the mutual fund fiduciary duties "with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser."

395.   Pursuant to Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), mutual fund shareholders may bring, on behalf of the Fund, a civil action against an investment adviser or any affiliated person who has breached his or its fiduciary duty concerning such compensation or other payments.

396.   Distributor defendant AFD (an affiliated person of CRMC) as a matter of statutory law, owed the Fund fiduciary duties with respect to its receipt of compensation for services, paid by the Fund, or by the shareholders thereof.

397.   Distributor defendant AFD as a matter of statutory law, owed the Fund fiduciary duties with respect to payments of a material nature, paid by the Fund, or by the shareholders thereof, either to AFD or by AFD.

398.   For the reasons set forth in detail above, the Fund and its shareholders have paid to AFD (and are continuing to pay to AFD) hundreds of millions of dollars in 12b-1 fees which are excessive and disproportionate, and hence unlawful, when

considering, among other things:  (i)  the nature and quality of the services provided by the defendants to the Fund and its shareholders did not justify the fees; (ii)   the profitability of the mutual fund to the adviser-manager; (iii) the defendants received "fall-out" benefits which benefitted them but not the Fund, and the defendants did not reduce their fees to reflect the fall-out benefits they received; (iv)   there were economies of scale, but those economies were not passed on to the Fund and its shareholders but were kept by defendants; (v) the fees charged the Fund were materially higher than those charged by other comparable funds; and (vi) the board of directors did not exercise the independence and conscientiousness required, including but not limited to that the Fund's 12b-1 plans should not have been reapproved in any form with respect to the damages period herein, or at the least should have been reapproved only with a substantial decrease in the amount of the fee.

399.    There is no reasonable likelihood that the 12b-1 fees benefitted both the Fund and its shareholders.

400.    Concerning that part of the advisory fees constituting fall-out benefits, defendant CRMC as a matter of statutory law, owed the Fund fiduciary duties with respect to its receipt of compensation for services, paid by the Fund, or by the shareholders thereof.

401.    CRMC received advisory fees which were excessive and disproportionate fall-out benefits as a result of the excessive and disproportionate 12b-1 fees, based upon the same factors identified above.

402.    By virtue of the foregoing, the defendants on this Claim breached their fiduciary duties under Section 36(b) of the ICA by charging the Fund and its shareholders hundreds of millions of dollars in 12b-1 fees which were excessive and disproportionate in that the 12b-1 fees were for payments (or the accrual of a liability for payment) prohibited under ICA Section 12 and Rule 12b-1.

403.    By virtue of the foregoing, the defendants on this Claim violated Section 36(b) of the ICA, and are liable to the Fund on behalf of the Fund's shareholders (and

directly to those shareholders who no longer have accounts with the Fund).

404.   As a direct and proximate result of defendants' breaches of their fiduciary duties as alleged herein, the Fund and its shareholders have suffered damages, in the amount of at least $150 million by, among other things:  (a) the adoption and approval, and reapproval, of the 12b-1 Plans of Distribution, and (b) the payment (or the accrual of a liability for payment) by the Fund and its shareholders of more than $150 million in unlawful 12b-1 and other fees (beginning one year prior to the institution of this action, and continuing beyond the date hereof), in an amount to be proved at trial.

405.   Since plaintiffs in *Corbi* are no longer asserting claims with respect to the Fund, plaintiff here asserts those claims for the Fund, for additional hundreds of millions of dollars, for the time period beginning one year prior to the filing of the complaint in *Corbi* through and including one year and one day prior to the filing of the complaint herein, and incorporates herein those allegations from the *Corbi* complaint with respect to the time period ending one year and one day prior to the filing of the complaint herein (but, to the extent there is a disparity between them, plaintiff's allegations herein are controlling).

## SECOND CLAIM FOR RELIEF
### For Violation Of §36(b) of the ICA, against CRMC

406.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

407.   The defendant in this Claim is CRMC.

408.   Pursuant to Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), the investment adviser, principal underwriter, directors and officers of a mutual fund owe to the mutual fund fiduciary duties "with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser."

409.   Defendant CRMC as a matter of statutory law, owed the Fund fiduciary

duties with respect to its receipt of compensation for services, paid by the Fund, or by the shareholders thereof.

410.   For the reasons set forth in detail above, the Fund and its shareholders have paid to CRMC (and are continuing to pay to CRMC) millions of dollars in advisory fees which are excessive and disproportionate, and hence unlawful, when considering, among other things, those factors identified above:  (i)  the nature and quality of the services provided by the defendants to the Fund and its shareholders did not justify the fees; (ii)  the profitability of the mutual fund to the adviser-manager; (iii) the defendants received "fall-out" benefits which benefitted them but not the Fund, and the defendants did not reduce their fees to reflect the fall-out benefits they received; (iv) there were economies of scale, but those economies were not passed on to the Fund and its shareholders but were kept by defendants; (v) the fees charged the Fund were materially higher than those charged by other comparable funds; and (vi) the board of directors did not exercise the independence and conscientiousness required.

411.   By virtue of the foregoing, defendant CRMC breached its fiduciary duties under Section 36(b) of the ICA by charging the Fund and its shareholders hundreds of millions of dollars in advisory and other fees which were excessive and disproportionate.

412.   By virtue of the foregoing, defendant CRMC violated Section 36(b) of the ICA, and is liable to the Fund on behalf of the Fund's shareholders (and directly to those shareholders who no longer have accounts with the Fund).

413.   As a direct and proximate result of CRMC's breaches of its fiduciary duties as alleged herein, the Fund and its shareholders have suffered damages in the hundreds of millions of dollars, in an amount to be proved at trial.

414.   Since plaintiffs in *Corbi* are no longer asserting claims with respect to the Fund, plaintiff here asserts those claims for the Fund, for additional hundreds of millions of dollars, for the time period beginning one year prior to the filing of the complaint in *Corbi* through and including one year and one day prior to the filing of the

complaint herein, and incorporates herein those allegations from the *Corbi* complaint with respect to the time period ending one year and one day prior to the filing of the complaint herein (but, to the extent there is a disparity between them, plaintiff's allegations herein are controlling).

## REQUESTS FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

(a)     An order providing for relief, including but not limited to declaratory and injunctive relief, including the following:

(1)     declaring that defendants' 12b-1 fees charged or assessed are excessive, disproportionate and unlawful;

(2)     declaring that defendants' advisory fees are excessive, disproportionate and unlawful;

(3)     awarding plaintiff on behalf of the Fund compensatory damages with respect to the unlawful 12b-1 fees, advisory fees, and other fees, taken from the Fund, jointly and severally against the defendants to the extent appropriate, in an amount to proved at trial;

(4)     ordering the defendants to cease the charging of excessive fees;

(5)     rescinding the 12b-1 Plans and the investment advisory contract adopted by the Fund;

(6)     removing each of the independent Directors/Trustees of the Fund and replacing them with truly independent Directors;

(7)     removing the Adviser Defendant and the Distributor Defendant;

(8)     awarding such other and further relief as this Court may deem just and proper including any extraordinary equitable and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the defendants' assets to assure plaintiff has an effective remedy (including but not limited to an accounting and restitution); and

(9)     Other equitable relief that the Court may deem proper.

1    (b)    An award of prejudgment and post judgment interest.

2    (c)    An award of attorneys' fees and the costs and expenses of this litigation,

3    including experts' fees; and

4    (d)    Any other or further relief that this Court deems just and equitable.

5    <u>**JURY TRIAL DEMANDED**</u>

6    Plaintiff demands a trial by jury on all issues so triable.

7    DATED:  July 30, 2009

8                             WOLF HALDENSTEIN ADLER
                              FREEMAN & HERZ LLP
9

10

11                            FRANCIS M. GREGOREK (144785)
12                            BETSY C. MANIFOLD (182450)
                              RACHELE R. RICKERT (190634)
13                            750 B Street, Suite 2770
                              San Diego, CA 92101
14                            Telephone:  619/239-4599
                              Facsimile:   619/234-4599
15                            gregorek@whafh.com
                              manifold@whafh.com
16                            rickert@whafh.com

17                            WOLF HALDENSTEIN ADLER
                               FREEMAN & HERZ LLP
18                            DANIEL W. KRASNER
                              ROBERT B. WEINTRAUB
19                            270 Madison Avenue
                              New York, New York 10016
20                            Telephone:  212/545-4600
                              Facsimile:   212/545-4653
21                            krasner@whafh.com
                              weintraub@whafh.com
22

23                            Attorneys for Plaintiff

24    551151v5

25

26

27

28